IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Harrisonburg Division

BRENDA F. ELLIS,                    )
        Plaintiff,                  )
                                    )
v.                                  )        Civil Action No. 5:13-cv-00043
                                    )
CAROLYN W. COLVIN,                  )
Acting Commissioner of Social Security,  )   By:    Joel C. Hoppe
        Defendant.                  )               United States Magistrate Judge

**<u>REPORT AND RECOMMENDATION</u>**

Plaintiff Brenda F. Ellis brought this action for review of the Commissioner of Social

Security's ("Commissioner") decision denying her claim for disability insurance benefits (DIB)

under Title II of the Social Security Act (the "Act"). On appeal, Ellis argues that the

Commissioner erred in evaluating her residual functional capacity ("RFC") when he gave

insufficient weight to the opinions of two of her treating physicians and also erred in relying on

the testimony of the vocational expert.[1] After carefully reviewing the record, I find that the

Commissioner's decision is not supported by substantial evidence and **RECOMMEND** that the

Commissioner's decision be reversed and the case be remanded pursuant to the fourth sentence

of 42 U.S.C. § 405(g).

I.    The Legal Framework

The Social Security Act authorizes this Court to review the Commissioner's final

determination that a person is not entitled to disability benefits. *See* 42 U.S.C. §§ 405(g) (DIB);

*see also Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is

limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute

_____

[1] At oral argument, Ellis argued that the ALJ erred in not finding her other impairments,
including endometriosis and migraine, severe. Ellis did not raise this argument in her brief, and I
will not consider it.

[its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, the Court asks only whether substantial evidence supports the ALJ's factual findings and whether the ALJ applied the correct legal standards. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011).

Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence," *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review takes into account the entire record, and not just the evidence cited by the ALJ. *See Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984); *see also Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951). Ultimately, this Court must affirm the ALJ's factual findings if "'conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled.'" *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (internal quotation marks omitted)). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" if he or she is unable engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505(a). Social Security ALJs follow a five-step process to determine whether an applicant is disabled. The ALJ asks, in sequence, whether the applicant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to

his or her past relevant work based on his or her residual functional capacity; and if not (5) whether he or she can perform other work. *See* 20 C.F.R. § 404.1520(a)(4); *see also Heckler v. Campbell*, 461 U.S. 458, 460–462 (1983). The applicant bears the burden of proof at steps one through four. *Hancock*, 667 F.3d at 472. At step five, the burden shifts to the agency to prove that the applicant is not disabled. *See id.*

## II. Procedural History

Ellis was born in 1964 (Administrative Record, hereinafter "R." 837), and at the time of the ALJ's decision was considered a "younger individual" under the Act. 20 C.F.R. § 404.1563(b), (c). She has an eleventh grade education and has worked as a sewing machine operator, poultry plant line worker, and housekeeper prior to her alleged onset date. (R. 173, 175.) She alleges a disability onset date of March 1, 2007,[2] due to several conditions, including pain, anemia, depression, suicidal ideation, endometriosis, iritis, and psoriatic arthritis. (R. 166, 174, 209.) The Commissioner rejected Ellis's application initially, upon reconsideration, and in a decision by an Administrative Law Judge ("ALJ") dated March 10, 2010. (R. 824.)

Ellis appealed the ALJ's decision, which became final when the Appeals Council denied her request for review on December 22, 2010, to this Court. (R. 824.). *See Ellis v. Astrue*, No. 5:11-cv-00008-MFU-BWC (W.D. Va. 2012). In an Order issued March 29, 2012, the Court adopted the Report and Recommendation of United States Magistrate Judge B. Waugh Crigler and remanded the case to the agency for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g). *Id.*, 2011 WL 5005305 (Oct. 20, 2011), *report and recommendation adopted by* 2012 WL 1069206 (Mar. 29, 2012). In remanding, the Court identified two errors in the ALJ's decision. First, the ALJ failed to grant controlling weight to the medical opinions of Ellis's

---

[2] Ellis's previous application for benefits was denied by ALJ decision dated Feb. 28, 2007. (R. 80–87.)

rheumatologist, Dr. Donald Martin, without giving an adequate reason for doing so. 2011 WL 5005305, at *3. Second, the ALJ failed to call a vocational expert to determine whether Ellis could find a job despite extensive evidence of non-exertional limitations on her ability to work. *Id.*

On remand, the agency again convened an administrative hearing via video conference on October 11, 2012, this time before a different ALJ. (R. 824, 845–90.) On October 16, the ALJ issued his decision finding Ellis not disabled under the Act. (R. 824–838.) He determined that she met insured status through December 31, 2008. (R. 827.) The ALJ found that Ellis had severe impairments of fibromyalgia, an affective disorder (depression), and an anxiety disorder, but that these impairments neither met nor medically equaled the severity of those listed in 20 C.F.R. part 404, Subpart P, Appendix 1. The ALJ also found that Ellis retained the ability to perform a limited range of sedentary work.[3] (R. 830–31.) In reaching his assessment of Ellis's RFC, the ALJ granted limited weight to the opinions of Dr. Martin and Dr. John Syptak. (R. 835–36.) Although Ellis's impairments prevent her from performing her past relevant work, the ALJ found that there are significant numbers of jobs in the national economy that she could perform. (R. 838.) Thus, the ALJ found Ellis not to be disabled under the Act. (R. 838). The Appeals Council denied Ellis's request for review and this appeal followed. (R. 806–09.)

---

[3] Specifically, the ALJ found that Ellis could sit for six hours and stand or walk for two hours in an eight hour day, but had to be allowed to sit for one hour and then stand for two to three minutes during the workday. He also found that Ellis could stoop only occasionally; never climb ladders, ropes, or scaffolds or be exposed to unprotected heights or moving mechanical parts; have only occasional contact with supervisors, co-workers, and the public; and perform only goal-oriented jobs and not production rate work. (R. 830–31.)

III. Discussion

*A.    Residual Functional Capacity and Treating Physicians*

Ellis first argues that the ALJ erred in finding that she had the RFC to perform sedentary work. (Pl. Br. 8–12.) Specifically, she contends that the ALJ should have given greater weight to the opinions of Dr. John Syptak, Ellis's primary physician, and Dr. David Martin, Ellis's treating rheumatologist. (Pl. Br. 8–12.)

*1.    Relevant Facts*

Dr. John Syptak has served as Ellis's primary care provider since 2004. (R. 514, 832.) Since then, he has treated her for several medical conditions, including fibromyalgia, arthritis, anxiety, and depression. (R. 388–416, 667–76, 747–62, 784–91.) To treat these conditions, he prescribed several medications, including Percocet, Wellbutrin, Effexor, Flexeril, and Ativan. (*Id.*)

Large portions of the treatment notes from the relevant period and afterward are illegible. However, it appears that Ellis complained of pain in her hips and stomach in early 2007, prior to her successful colon resection surgery in 2007. (R. 243, 391, 392.) In August and November 2007, she reported she was doing well, although she suffered a bout of strep throat in October. (R. 388, 389, 674, 676.) In January 2008, she reported that she felt pretty good. (R. 672.) Between February and April 2008, Dr. Syptak noted complaints of sinus problems. (R. 667–71.) Dr. Syptak noted a psoriatic arthritis flare in June 2008 and complaints of lower back pain and problems with her colon in July, but Ellis reported she was doing better in August. (R. 723, 761–62.) In September, October, and November 2008, Ellis complained of sinus pain. (R. 756–60.)

In January 2009, Dr. Syptak noted complaints of back and neck pain. (R. 752–54.) On her January 30 visit, Ellis reported chest pain, but refused admission to the hospital. (R. 752.) In February, Ellis's condition had improved, and she was feeling more comfortable. (R. 751.)

Likewise, in April, she reported that she was doing well and that Neurontin was helping her pain. (R. 749.) On May 5, Dr. Syptak indicated that Ellis looked good and felt good, and Ellis reported doing a little more work in the garden. (R. 748.) Treatment records indicate that Ellis suffered from an infection in June, but was feeling good in August and September. (R. 745, 787–89.)

Dr. Syptak also completed a RFC questionnaire dated February 15, 2008. (R. 514–18, 649–53.)[4] On the RFC questionnaire, Dr. Syptak indicated that Ellis carried diagnoses of fibromyalgia, depression, and arthritis and that she had a fair prognosis. (R. 514.) Dr. Syptak described Ellis's symptoms as including fatigue and generalized achiness and pain in her shoulders, elbows, fingers, hips, buttocks, knees, and ankles. (R. 514.) He indicated that Ellis suffered from anxiety and depression and that these conditions contributed to Ellis's limitations (R. 515.) He indicated that Ellis would be capable of low-stress jobs and that her pain or other symptoms would frequently interfere with attention and concentration needed to perform even simple work tasks. (R. 515.) In Dr. Syptak's opinion, Ellis could walk half a city block, sit for 15 minutes, and stand for 30 minutes before needing to rest. (R. 515.) He indicated that Ellis would be able to sit for less than 2 hours per day and that she would also be able to stand for less than 2 hours per day. (R. 516). Dr. Syptak noted that Ellis would have to walk around every 20 minutes for 5 minutes during the work day; would have to be able to shift at will between sitting, standing, and walking; and would require unscheduled breaks roughly every 15 minutes during the work day. (R. 516.) He did not believe that Ellis would need to elevate her legs with

_____

[4] The RFC questionnaire is in the record twice. Oddly, however, there are material differences between the two forms. The one the parties cite (R. 514–18) has "COPY" stamped on it and includes, in paragraphs "m" and "n," cross-outs/corrections as well as new information not included on the other questionnaire (R. 649–53). The parties have not addressed these discrepancies. Because the one labeled "COPY" appears to contain updated information and is the version cited by the parties, the Court will consider and cite it rather than the other version.

prolonged sitting. (R. 516.) Dr. Syptak indicated that Ellis would be able to lift up to 10 lbs. occasionally and 20 lbs. rarely. (R. 516.) He identified no limitations regarding neck movement, but limited Ellis to never climbing ladders and only rarely performing postural activities. (R. 517.) He assigned significant manipulative limitations, limiting Ellis to grasping, twisting, and turning 15% of the work day with her right hand and 20% of the work day with her left hand; fingering 20% of the work day with her right hand and 30% of the work day with her left hand; and reaching overhead 30% of the work day. (R. 517.) Finally, Dr. Syptak indicated that Ellis would need to be absent from work more than four days per month as a result of her impairments or treatment. (R. 517.)

Dr. Donald Martin, a rheumatologist at RMH Rheumatology, began treating Ellis on referral from Dr. Syptak on March 19, 2008. (R. 544–47, 551–54, 561–63, 557–59, 729–32.) Ellis reported to Dr. Martin that she had been suffering from fibromyalgia for 10 years, and that her three sisters also suffered from fibromyalgia. (R. 551–52.) Her complaints included initial and terminal insomnia, morning pain and stiffness of up to 2 hours' duration, swelling of her fingers, and a "cognitive fog." (R. 551.) On physical examination, Dr. Martin noted pan positive trigger points and neck discomfort with posterior extension. (R. 552.) Dr. Martin indicated that Ellis's "presentation is consistent with the fibromyalgia syndrome, given her disrupted and nonrestorative sleep, generalized and chronic pain, and pan-positive trigger points, as well as the unremarkable evaluation to date." (R. 552.) He recommended that she attempt a trial of salt and fluid loading and reminded her of the benefits of regular, progressive, low-impact aerobic exercise. (R. 553.)

Dr. Martin saw Ellis again on April 10. (R. 549–50, 555, 725–28.) He noted that Ellis was "little changed clinically" and that the salt and fluid loading trial had a minimal effect.

(R. 725.) He reviewed a current laboratory profile and a pelvic radiographic report from 2005. (*Id.*) Dr. Martin again diagnosed fibromyalgia and increased Ellis's prescriptions of trazodone from 50 mg to 100 mg at bedtime, and also prescribed gabapentin (Neurontin) at 300 mg three times per day. (R. 726.)

Ellis missed her follow-up appointment four weeks later, rescheduled for August 18, and subsequently missed that appointment as well. (R. 722, 724.) As a result, Ellis did not see Dr. Martin again until September 16, 2008. (R. 717–21.) At this visit, Ellis complained that her fibromyalgia symptoms had worsened considerably after she ran out of gabapentin, and she also complained of right shoulder discomfort. (R. 717.) Physical examination again revealed pan-positive trigger points. (R. 717.) Dr. Martin also noted limited abduction and diminished internal rotation due to pain in Ellis's right shoulder. (R. 717.) Ellis's shoulder pain was exacerbated by resisted abduction. (R. 717.) Dr. Martin also noted tenderness to palpitation over the subacrominal notch. (R. 717.) He diagnosed "[f]ibromyalgia, manifested by disrupted and nonrestorative sleep, generalized and chronic pain, and pan-positive trigger points," and noted that "[f]atigue, though remaining an issue, does not seem to be a priority on her part today." (R. 718.) He attributed Ellis's shoulder pain to either rotator cuff tendinitis or subacrominal bursitis, and requested a right-shoulder radiograph. (R. 718.) He instructed Ellis to try to increase her gabapentin dosage to 600 mg three times per day. (R. 718.)

Ellis followed up with Dr. Martin on February 9, 2009, complaining of "excruciating pain" in her spine. (R. 712.) She reported that she could only increase her gabapentin dosage to 600 mg two times per day due to side effects. (R. 712.) Physical examination again revealed pan-positive trigger points. (R. 713.) Dr. Martin diagnosed fibromyalgia and encouraged Ellis to start

an exercise program. (R. 713.) He also asked her to try to increase her bedtime dosage of trazodone from 50 mg to 100 mg. (R. 713.)

After missing an appointment scheduled for May 26, 2009, Ellis followed up with Dr. Martin on July 31. (R. 778–80, 801–05.) Ellis complained of bilateral hand numbness and paresthesias and "deep" left lateral thigh pain. (R. 801.) She explained that she was unable to increase her dosage of trazodone because "she wishes to get up with her husband to help him prepare for work." (R. 801.) On physical examination, Dr. Martin noted tenderness over the left greater trochanter, pan-positive trigger points, and positive bilateral Tinel and Phalen signs. (R. 802.) He diagnosed fibromyalgia, carpal tunnel syndrome, and left-sided trochanteric bursitis. (R. 802.) For Ellis's carpal tunnel syndrome, Dr. Martin prescribed bilateral wrist splints. (R. 802.) For her bursitis, he asked her to increase her daily dosage of naproxen (Aleve) for two weeks. (R. 802.) He also asked Ellis to try to increase her bedtime dosage of trazodone to 75 mg on days when she does not need to wake up with her husband. (R. 802.)

Dr. Martin did not see Ellis again until February 5, 2010. (R. 796–800.) On this visit, Ellis complained of left hip pain as well as right thumb pain. (R. 797.) She indicated that she was able to sleep through the night only two or three days per week and that increasing her bedtime dosage of trazodone had little effect on this. (R. 797.) Ellis had limited her gabapentin intake to only 300 mg twice daily because she couldn't afford to take more. (R. 798.) She also explained that she had been unable to exercise beyond walking to and from the mailbox once daily. (R. 797.) Ellis also told Dr. Martin that she had a disability hearing scheduled for February 24. (R. 797.) On physical examination, Dr. Martin identified tenderness in Ellis's right thumb, tenderness over the greater trochanter on both sides but especially on the left, pan-positive tender points, and positive Tinel sign bilaterally. (R. 798.) Dr. Martin diagnosed osteoarthritis,

9

trochanteric bursitis, carpal tunnel syndrome, and fibromyalgia. (R. 798.) He administered a steroid injection in her left hip for her trochanteric bursitis and instructed Ellis to ice her hip. (R. 799.)

Ellis returned for a follow-up on February 19, 2010. (R. 792–95.) She presented Dr. Martin with a "fibromyalgia residual functional capacity questionnaire," which Dr. Martin completed. (R. 792.) Ellis rated her pain as a 9 on a scale of 1 to 10. (R. 792.) Dr. Martin's diagnoses remained unchanged. (R. 792.)

On the fibromyalgia questionnaire, Dr. Martin indicated that Ellis met the American College of Rheumatology criteria for fibromyalgia. (R. 763.) He reported that, in addition to pan-positive trigger points, Ellis also suffered from multiple tender points, nonrestorative sleep, chronic fatigue, morning stiffness, muscle weakness, subjective swelling, irritable bowel syndrome, frequent severe headaches, premenstrual syndrome, temporomandibular joint dysfunction, numbness and tingling, anxiety, panic attacks, depression, carpal tunnel syndrome, and chronic fatigue syndrome. (R. 763.) After "other diagnosed impairments," Dr. Martin wrote "'chronic fatigue' + history of 'iritis.'" (R. 763.) He indicated that Ellis was not a malingerer and that emotional factors contribute to the severity of her pain. (R. 764.) Dr. Martin noted that Ellis suffered from "persistent, generalized pain [and] tenderness" bilaterally in her lumbosacral spine, cervical spine, thoracic spine, chest, shoulders, arms, hands/fingers, hips, legs, and knees/ankles/feet, and that Ellis's pain was aggravated by changing weather, fatigue, movement/overuse, cold, stress, hormonal changes, and static position. (R. 764.)

Dr. Martin offered a grim assessment of Ellis's functional capacity. (R. 764–66.) According to Dr. Martin, Ellis's pain would constantly interfere with the attention and concentration needed to perform even simple work tasks, and that Ellis was incapable of even

low-stress jobs. (R. 764.) She could not walk a city block without rest or severe pain, could sit for only 15 minutes at a time and less than two hours total in an eight-hour work day, and could stand for only 15 minutes at a time and less than two hours total in an eight-hour work day. (R. 765.) She would need five-minute breaks to walk every ten minutes during the work day and would be required to shift at will between sitting, standing, and walking. (R. 765.) Moreover, Ellis would need to take unscheduled five-minute breaks every 15 minutes during the work day, during which she would have to either lie down or sit quietly. (R. 765.) If subjected to prolonged sitting, Ellis would have to elevate her legs to waist height. (R. 765.) She could carry less than ten pounds occasionally but never ten pounds or more and never twist, stoop or bend, crouch or squat, or climb ladders or stairs. (R. 766.) She could occasionally look down, turn her head right or left, look up, or hold her head in a static position. (R. 766.) She could never grasp, twist, or turn objects with her hands, perform fine manipulation with her fingers, or reach with her arms. (R. 766.) Ellis would also suffer more than four "bad days" per month. (R. 766.) Finally, Dr. Martin indicated that Ellis suffered from this degree of symptoms and limitations since 1998. (R. 766.)

The ALJ noted Dr. Syptak and Dr. Martin's opinions that Ellis "had a residual functional capacity for less than a full range of sedentary work, that she had significant postural and manipulative limitations, and that her impairments and treatment would result in work absences of more than four days per month." However, he gave these opinions little weight:

> The assessment of primary care physician Dr. Syptak warrants limited weight because his recommended limitations are not supported by the limited objective findings in his treatment notes or with the routine nature of his conservative medical care, nor were they consistent with the claimant's admitted activities of daily living. As for Dr. Martin, while he is a specialist in rheumatology, his opinion also warrants limited weight because his objective findings on three examinations between March 2008 and September 2008 (with two missed appointments in May and July 2008) did not reflect signs or symptoms consistent

with his suggested restrictions made as of February 2010. Furthermore, the credibility of his assessment is diminished by his statement that the claimant had this degree of symptoms and limitations since 1998 (ten years before he treated her), at which time she was working and engaging in substantial gainful activity, which she continued to perform through 2003.

(R. 835.)

*2. Discussion*

An ALJ must consider and evaluate all opinions from "medically acceptable sources," such as doctors, in the case record. 20 C.F.R. § 404.1527. In determining what weight to afford a doctor's opinion, the ALJ must consider all relevant factors, including the relationship between the doctor and the patient, the degree to which the opinion is supported or contradicted by other evidence in the record, and whether the doctor's opinion pertains to his area of specialty. 20 C.F.R. § 404.1527(c).

Opinions from physicians who have treated the patient are generally afforded more weight, because treating sources are "most able to provide a detailed longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence." 20 C.F.R. § 404.1527(c)(2); *accord Hines v. Barnhart*, 453 F.3d 559, 563 (4th Cir. 2006). An ALJ must give a treating source opinion "controlling weight" to the extent that the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and … not inconsistent with the other substantial evidence in the record." *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001); 20 C.F.R. § 404.1527. Even when a treating source opinion is less than "well-supported" by diagnostic techniques, it is still entitled to a measure of deference. *Tucker v. Astrue*, 897 F. Supp. 2d 448, 465 (S.D.W. Va. 2012) (citing Social Security Ruling 96-2p). However, an ALJ may reject a treating physician's opinion in whole or in part if there is "persuasive contrary evidence" in the record. *Hines*, 453 F.3d at 563 n. 2; *Mastro*, 270 F.3d at 178; *Tucker*, 897 F. Supp. 2d at 465. When an ALJ gives less than controlling weight to a

treating physician's opinion, the treating source rule requires him to specify how much weight he gives the opinion and offer "good reasons" for that decision. 20 C.F.R. § 404.1527(c)(2).

Not every statement from a doctor regarding a patient's condition qualifies as a "medical opinion. "Medical opinions are statements from … acceptable medical sources that reflect judgments about the nature and severity of [the applicant's] impairment(s)," including: (1) the applicant's symptoms, diagnosis, and prognosis; (2) what the applicant can still do despite his or her impairment(s); and (3) the applicant's physical or mental restrictions. 20 C.F.R. § 404.1527(a)(2). However, opinions on issues "reserved to the Commissioner," such as whether a person is disabled, are not considered "medical opinions" entitled to any special weight under the regulations. 20 C.F.R. § 404.1527(d)(1); Social Security Ruling ("SSR") 96-5p, 1996 WL 374183; *Huff v. Astrue*, No. 6:09cv42, 2010 WL 5296842, at *5 (W.D. Va. Nov. 22, 2010). At the same time, statements from treating physicians on issues reserved to the commissioner are relevant and often important evidence. The ALJ must evaluate these statements in light of the whole record to determine the extent to which the opinion is supported by the record, considering the same factors used to evaluate "medical opinions." SSR 96-5p, at *3; *see also* 20 C.F.R. § 404.1527(c).

### a.    Dr. Syptak's Opinion

The ALJ offered three reasons for affording little weight to Dr. Syptak's opinion: the lack of objective findings in treatment notes, the routine and conservative nature of his treatment, and inconsistency with Ellis's reported daily activities. (R. 835.) Ellis objects to each of these reasons.

First, Ellis argues that her medical records corroborate, not controvert, her doctors' opinions about her limitations. (Pl. Br. 9, 11.) She states that the record "contains physical

examinations that reveal chronic pain and other symptoms associated with fibromyalgia."[5] (Pl. Br. 11.) She also notes that there is no objective test for fibromyalgia. (Pl. Br. 9.) The Commissioner defends the ALJ's use of the treatment notes to cast doubt on Ellis's doctors' opinions. (Def. Br. 12–13.)

Social Security regulations allow ALJs to consider a physician's treatment records, including any objective findings, in weighing the physician's opinions. "The more a medical source presents evidence relevant to support an opinion, particularly medical signs and laboratory findings, the more weight [the ALJ] will give that opinion." 20 C.F.R. § 404.1527(c)(3). However, the lack of objective findings in Ellis's treatment notes says relatively little about the severity of Ellis's fibromyalgia. This is because, as Ellis notes, there is no objective laboratory test for fibromyalgia. *See Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) ("[Fibromyalgia]'s symptoms are entirely subjective."); *Tucker v. Astrue*, No. 5:11cv000137, 2013 WL 1211583, at *4 (W.D. Va. Mar. 1, 2013) ("[N]ormal physical examination findings, which the Law Judge did not specifically consider in her report, are not unusual or highly relevant to diagnosing fibromyalgia or its severity, as fibromyalgia patients typically manifest normal strength, neurological reactions, and range of motion." (citing *Preston v. Sec'y of Health & Human Services*, 854 F.2d 815, 819–20 (6th Cir. 1988))), *report and recommendation adopted*, 2013 WL 1196672 (W.D. Va. Mar. 25, 2013). Indeed, fibromyalgia is largely a diagnosis of exclusion based in part on the *absence* of objective signs, aside from the

---

[5] One of the more common symptoms noted in Ellis's medical records is "pan-positive trigger points" or "pan-positive tender points." Trigger points are areas where fibromyalgia patients feel abnormal pain or sensitivity when light pressure is applied. There are 18 trigger points doctors check when considering a diagnosis of fibromyalgia. When Dr. Martin indicates that Ellis exhibited "pan-positive" trigger points, he is indicating that, when he examined her, she experienced pain/sensitivity to light pressure at all 18 of these points.

presence of "trigger" or "tender" points—which, as the Commissioner admitted in her brief (*see* Def. Br. 12.), Ellis consistently displayed. *See Johnson v. Astrue*, 597 F.3d 409, 413 (1st Cir. 2009) (noting that a lack of objective findings "is what can be expected in fibromyalgia cases"); *Preston*, 854 F.2d at 818; *see also* SSR 12-2P, 2012 WL 3104869 (explaining how Commissioner evaluates criteria of fibromyalgia). Moreover, not only is fibromyalgia's diagnosis based on clinically observed symptoms rather than laboratory testing, "it is difficult to determine the severity of [fibromyalgia] because of the unavailability of objective clinical tests." *Sarchet*, 78 F.3d at 307.

Several courts of appeals have held that ALJs may not rely on the lack of objective findings in discrediting a treating doctor's opinion regarding the severity of a patient's fibromyalgia. *Johnson*, 597 F.3d at 412 (reversing ALJ decision discounting treating doctor's RFC assessment based on, among other reasons, lack of objective medical evidence); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243–46 (6th Cir. 2007) (reversing ALJ's rejection of treating doctor's fibromyalgia diagnosis based on lack of objective evidence); *Green-Younger v. Barnhart*, 335 F.3d 99, 108 (2d Cir. 2003) (reversing ALJ decision affording less than controlling weight to treating doctor's opinion regarding severity of patient's fibromyalgia based on lack of objective findings). Likewise, district courts in this circuit have recognized that a lack of objective findings is not a good reason to discount a treating physician's opinion regarding the existence or severity of a patient's fibromyalgia. *Robertson v. Astrue*, No. 6:10-597-HMH-KFM, 2011 WL 1559058, at *3 (S.D.S.C. April 25, 2011); *Stahlman v. Astrue*, No. 3:10CV475, 2011 WL 2471546, at *6–7 (E.D. Va. May 17, 2011). Absence of objective signs "is no more indicative that the patient's fibromyalgia is not disabling than the absence of a headache is an indication that a patient's prostate cancer is not advanced." *Sarchet*, 78 F.3d at 307. Accordingly,

the lack of objective findings in Dr. Syptak's treatment notes is far from sufficient to support the ALJ's reject his opinion regarding his patient's limitations.

The ALJ's second reason for discounting Dr. Syptak's opinion—that it was inconsistent "with the routine nature of his conservative medical care"—is also inadequate. (R. 835.) Earlier in his opinion, in evaluating the credibility of Ellis's statements about the severity of her pain, the ALJ noted that Ellis's fibromyalgia "and associated generalized pain, trigger points, fatigue and non-restorative or disruptive sleep have been treated with a variety of medications and encouragement that she engage in no-impact or low-impact exercise." (R. 834.) He also noted that she did not require an assistive device to stand or walk prior to her date last insured, and that her only surgery prior to her date last insured was related to gastrointestinal issues. (R. 834.) The ALJ apparently regarded this treatment as too conservative for a patient with disabling fibromyalgia pain.

Under the pain standard, 20 C.F.R. § 404.1529, an ALJ may properly consider a claimant's course of treatment in assessing whether the claimant's statements about her pain are credible. 20 C.F.R. § 404.1529(c)(3). This evidence is also appropriately considered in evaluating a physician's opinions about the severity of a claimant's pain or other subjective symptoms. A physician who believes that a patient's pain is particularly severe is more likely to recommend that a patient consider more aggressive treatment options. Conversely, an assertion that a patient's pain is disabling is arguably inconsistent with a conservative course of treatment. *See* 20 C.F.R. § 404.1527(c)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion."). Here, Ellis's doctors treated her fibromyalgia with medication and instructions to exercise. Medication is generally considered conservative treatment for pain. *See Hauser v. Commissioner of Social Security*, No. 1:12-cv-

796, 2014 WL 48554, at *9 (S.D. Ohio Jan. 7, 2014) ("[I]t is proper to classify taking prescription medication and receiving injections as 'conservative' treatment."); *Shaw v. Colvin*, No. 4:12CV451, 2013 WL 3546665, at *9, 18 (E.D. Mo. July 11, 2013) (characterizing prescription of Percocet as "conservative treatment").

However, this sort of reasoning has its limits. Because "[m]any potentially disabling conditions can be treated by routine and conservative treatment," the characterization of treatment as conservative "alone does not provide any insight into the severity of a given condition and may even belie the condition's seriousness." *Viverette v. Astrue*, No. 5:07-cv-395-FL, 2008 WL 5087419, at *2 (E.D.N.C. Nov. 24, 2008). A claimant cannot be faulted "for failing to pursue non-conservative treatment options where none exist." *Lapierre-Gutt v. Astrue*, 382 Fed. Appx. 662, 664 (9th Cir. 2010). In particular, the treatment options available for fibromyalgia are all conservative in nature. Mayo Clinic, *Fibromyalgia Treatments and drugs*, http://www.mayoclinic.org/diseases-conditions/fibromyalgia/basics/treatment/con-20019243 (*last visited* April 30, 2014) ("In general, treatments for fibromyalgia include both medication and self-care."); American College of Rheumatology, *Fibromyalgia*, http://www.rheumatology.org/Practice/Clinical/Patients/Diseases_And_Conditions/Fibromyalgia (last visited April 30, 2014) (identifying medications and non-drug treatments as potentially appropriate for fibromyalgia). Surgery is not recommended for fibromyalgia, *Brosnahan v. Barnhart*, 336 F.3d 671, 677 (8th Cir. 2003), and can actually make the condition worse, 6 *Attorneys Medical Advisor* § 44.59 (2014) (citing Aaron *et al.*, *Perceived Physical and Emotional Trauma as Precipitating Events in Fibromyalgia*, 40 Arthritis & Rheumatism 453 (No. 3 (Mar.) 1997)). It is also not clear that trigger point injections, although commonly used, are effective in treating fibromyalgia pain. Goldenberg, Burckhardt & Crofford, *Management of*

*Fibromyalgia Syndrome*, 292 JAMA 2388, 2390, 2392 (2004), available at

http://jama.jamanetwork.com/article.aspx?articleid=199786.

Recognizing this evidence, many courts have appropriately viewed with skepticism ALJ

decisions citing conservative treatment to discredit a claimant or her treating physicians. *See,*

*e.g.*, *Johnson*, 597 F.3d at 412 ("The ALJ next found that Dr. Ali's RFC opinion was inconsistent

with his prescription of physical therapy and aerobic exercise. The first problem with this

reasoning is that this is the appropriate treatment for fibromyalgia."); *Grimsley v. Astrue*, No.

1:07cv00763, 2009 WL 737109, at *7 (M.D.N.C. Mar. 23, 2009); *Hyer v. Colvin*, No. 3:12-cv-

0054(GTS/DEP), 2013 WL 1193444, at *7–8 (N.D.N.Y. Feb. 27, 2013); *Davis v. Astrue*, Civ.

No. 12-2056, 2012 WL 5902401, at *7 (W.D. Ark. Nov. 5, 2012); *McVey v. Astrue*, No. CIV-11-

1028-HE, 2012 WL 5520741, at *4 (W.D. Okla. Oct. 12, 2012). But that doesn't mean an ALJ

may not consider the nature of treatment at all in fibromyalgia cases. Even for fibromyalgia

patients, it is possible to differentiate between a relatively aggressive course of treatment, *see,*

*e.g.*, *Grimsley*, 2009 WL 737109, at *7 ("The medical records reflect … that [the plaintiff's

rheumatologist] repeatedly changed [her] medications and dosages in an effort to better alleviate

her pain and fatigue."), and a relatively conservative one, *see, e.g.*, *Cordell v. Astrue*, No. 4:09-

cv-19, 2010 WL 446944, at *15 (E.D. Tenn. Feb. 2, 2010) ("Here, in a single treatment note

from December 2005, Dr. Mangru diagnosed Plaintiff with fibromyalgia and prescribed a rather

conservative course of care consisting of psychotropic medications [Effexor and Lyrica] and

continued physical therapy…."). Furthermore, "when considered with other information, the

routine nature of a course of treatment may indicate that a condition is not as severe as a

plaintiff's subjective complaints may otherwise indicate." *Viverette*, 2008 WL 5087419, at *2.

Here, however, it is not so clear that Ellis's treatment was particularly "conservative," given that fibromyalgia was the principal cause of her pain. The fact that Ellis did not require surgery says absolutely nothing about her fibromyalgia; the fact that she did not use an assistive device to walk says little more. *See Cota v. Commissioner*, No. 1:08-cv-00842-SMS, 2009 WL 900315, at *10 (E.D. Cal. Mar. 31, 2009) ("[B]ecause an absence of muscle strength is not a marker of fibromyalgia, ability to move without assistive devices is not significantly inconsistent with Plaintiff's subjective complaints."). Moreover, before Ellis first saw Dr. Martin, she had been treated with "a host of agents," including Aleve, diclofenac, Flexeril, amitriptyline, lorazepam, trazodone, Effexor, Wellbutrin, prednisone, and methotrexate.[6] (R. 551.) In March 2008, her fibromyalgia medication regimen included Aleve 220–440 mg twice a day as needed, Percocet 5/325 mg two pills every four hours as needed, and trazodone 50 mg at bedtime. (R. 283, 552, 726.) In April 2008, Dr. Martin prescribed Neurontin (gabapentin) 300 mg three times per day. (R. 726.). During the relevant period, Dr. Martin attempted to increase Ellis's daily dosage of Neurontin from 900 mg to 1800 mg, but Ellis found daily dosages exceeding 1200 mg intolerable or unaffordable. (R. 712, 718.) He also tried to increase her bedtime dosage of trazodone to 100 mg, although Ellis was unwilling to comply with this because she wanted to arise with her husband to help him prepare for work. (R. 713, 726, 801.)

Although Ellis's treatment was not particularly conservative for fibromyalgia patients, it was not particularly aggressive, either. She saw Dr. Martin only three times between her first visit in March 2008 and her date last insured in December 2008, and she missed appointments in May and August. (R. 722, 724.) Most fibromyalgia sufferers are not disabled, *Sarchet*, 78 F.3d at

---

[6] It is not entirely clear from the record that all of these medications were prescribed to treat Ellis's fibromyalgia symptoms and not her other impairments, which included anxiety, depression, or tobacco abuse.

307, and the lack of objective findings and medication-based treatment in Ellis's case are typical of many non-disabled fibromyalgia sufferers. But that is also true of many who suffer from disabling fibromyalgia pain. The absence of objective findings and a "conservative" course of treatment including narcotic pain medications, while somewhat probative of non-disability, is not "persuasive contrary evidence" that warrants giving little weight to a treating physician's opinion about the severity of a patient's pain. *Hines v. Barnhart*, 453 F.3d 559, 563 (4th Cir. 2006).

The ALJ's final reason for discounting Dr. Syptak's opinion—that it is inconsistent with Ellis's reported daily activities—is even less persuasive than his first two. It is true that an ALJ may consider a claimant's daily activities in assessing the severity of a claimant's symptoms such as pain. 20 C.F.R. § 404.1529(c)(3); *Keen v. Astrue*, No. 1:08-cv-00031, 2010 WL 308806, at *2 (W.D. Va. Jan. 28, 2012); *Weddle v. Barnhart*, No. 7:06cv00686, 2007 WL 2471442, at *5 (W.D. Va. Aug. 31, 2007). Likewise, an ALJ may also consider a claimant's activities of daily living in weighing opinions of medical experts. 20 C.F.R. § 404.1527(c)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give that opinion."); *Phillips v. Astrue*, No. 7:12-cv-194, 2013 WL 485949, at *7 (W.D. Va. Feb. 5, 2013).

The ALJ does not identify which of Ellis's daily activities are inconsistent with Dr. Syptak's opinion. However, he did discuss Ellis's daily activities in various parts of his opinion. The ALJ noted that Ellis could "occasionally shop for brief periods or accompany her husband shopping, read and watch television" and that she "even … assist[ed] in the care of her granddaughter (in 2008) while her daughter was incarcerated." (R. 835.) Additionally, Ellis "could generally take care of her personal needs independently (needing help only due to her pain), prepare simple foods such as sandwiches and frozen dinners (and for a time, she could prepare complete meals two to three times per week), and when not experiencing pain, she could

wash dishes, dust, and help her husband fold laundry for brief periods." (R. 829.) Ellis "relied on her husband to handle … finances" due to her problems with concentration and memory and reported having trouble remembering television shows she watched, but she "was able to drive for short periods of time" and also "spent some time reading." (R. 830.)

Both this ALJ and the previous one noted that Ellis "was assisting in the care of her granddaughter (in 2008) while her daughter was incarcerated." (R. 18, 835.) The only evidence of this fact in the record is a remark plucked from a February 11, 2008 progress note in mental health treatment records stating, "patient also helps care for her grand daughter." (R. 523.) By itself, this vague statement reveals little about Ellis's activities of daily living and even less about her capacity for substantial gainful employment. For all the Court (or for that matter, the ALJ) knows, the "assistance" Ellis provided may have been limited to watching the child for brief periods of time while no other adult was present.

Ellis's daily activities, as the ALJ described them, are modest. It is difficult to see how these activities undermine Dr. Syptak's opinions regarding Ellis's limitations. *Cf. Nickodam v. Astrue*, No. 2:10-cv-00028, 2011 WL 652460, at *4 (W.D. Va. Feb. 15 2011) ("In addition, [the claimant's] activities of daily living do not undermine [his treating doctor's] opinion because none of the reported activities of daily living, such as caring for his personal needs, driving, and shopping, were inconsistent with the limitations outlined by [the doctor]."). In many respects, Ellis's daily activities corroborate Dr. Syptak's opinion. Her activities were of short duration and were limited or, at times, precluded by pain.

As courts both in this circuit and elsewhere have recognized, a claimant's ability to perform modest activities of daily living with some assistance is not a reason to reject claims of disabling pain. *Bartley v. Astrue*, No. 5:08cv089, 2009 WL 3712682, at *9 (W.D. Va. Nov. 3,

2009); *Williams v. Colvin*, No. 5:13-cv-124-BO, __ F. Supp. 2d. ___, ___, 2014 WL 652596, at *3 (E.D.N.C. Feb. 19, 2014) ("'[T]he ability to do activities such as light housework and visiting with friends provides little or no support for the finding that a claimant can perform full-time competitive work.'" (quoting *Hogg v. Shalala*, 45 F.3d 276, 278 (8th Cir. 1995))); *Rogers*, 486 F.3d at 248–49 (noting that fibromyalgia sufferer's "somewhat minimal daily functions are not comparable to typical work activities"); *Thompson v. Sullivan*, 987 F.2d 1482, 1490 (10th Cir. 1993) ("The 'sporadic performance [of household tasks or work] does not establish that a person is capable of engaging in substantial gainful activity.'" (quoting *Frey v. Bowen*, 816 F.2d 508, 516–17 (10th Cir. 1987) (alterations in original))). "[A claimant's] ability to struggle through the activities of daily living does not mean that she can manage the requirements of a modern workplace." *Punzio v. Astrue*, 630 F.3d 704, 712 (7th Cir. 2011). This is because daily activities differ from the requirements of gainful employment in several important respects. *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012). A person has flexibility in scheduling her daily activities, can get help from other persons, and is not held to a minimum standard of performance; by contrast, an employer expects an employee to perform tasks proficiently, independently, and in a timely manner. *Id.*

Ellis's daily activities are substantially similar to those of the claimant in *Bartley v. Astrue*, No. 5:08cv089, 2009 WL 3712682 (W.D. Va. Nov. 3, 2009), *report and recommendation adopted*, 2009 WL 4155920 (W.D. Va. Nov. 24, 2009). In *Bartley*, the ALJ found the claimant's statements about the severity of her pain not credible based in part on the claimant's daily activities, which the ALJ regarded as "inconsistent with a complete inability to work." *Id.* at *9. The claimant's activities included "cooking once per day, dusting once per week, shopping with assistance every two weeks, reading the newspaper, talking on the phone,

[and] watching television." *Id.* Like the ALJ in this case, the ALJ in *Bartley* did not identify which of the claimant's daily activities were inconsistent with the claimant's testimony. *Id.* Then-Magistrate Judge Urbanski found that the ALJ's credibility assessment was not supported by substantial evidence. *Id.* Ellis's activities are scarely more extensive than Bartley's. "To suggest that the minimal daily activities such as those performed by [Ellis] … are somehow indicative of her ability to engage in work is clear error." *Bartley*, 2009 WL 3712682, at *9.

The evidence in the record of Ellis's daily activities tends to corroborate, rather than undermine, Dr. Syptak's opinion. The ALJ erred in finding these activities inconsistent with Dr. Syptak's opinion without identifying any inconsistency. Because the ALJ failed to articulate a sufficient reason for discounting Dr. Syptak's opinions, I find that his decision is not supported by substantial evidence.

> b.      *Dr. Martin's Opinion*

The ALJ offered two reasons for giving limited weight to the opinion of Dr. Martin, Ellis's rheumatologist—the lack of objective findings in his treatment records supporting the alleged severity and inconsistency between Dr. Martin's opinion and other evidence in the record. For reasons explained above, the absence of objective findings in Dr. Martin's treatment notes bears little on the degree of Ellis's fibromyalgia-related pain. However, the ALJ's second reason for discrediting Dr. Martin's opinion was more than sufficient.

ALJs may consider discrepancies between statements of a treating physician and other evidence in determining how much weight to give to the treating physician's opinion. 20 C.F.R. § 404.1527(c)(4). Dr. Martin's opinion that Ellis had practically disabling limitations since 1998 is, as the ALJ points out, simply not consistent with the record, given that Ellis engaged in substantial gainful activity from 1998 through 2003. (R. 835–36.) Resolving such conflicts in the evidence is the ALJ's job, not the Court's. *Richardson v. Perales*, 402 U.S. 389, 399 (1971).

How much of a witness's testimony to credit, when the witness is impeached or evidence inconsistent with the witness's testimony is introduced, is the sort of determination that has always fallen to the trier of fact.

Of course, an ALJ may not cherry-pick trivial inconsistencies between a treating physician's opinion and the record to discount the physician's opinion generally. *Bryant v. Colvin*, No. 3:12-cv-0307-CAN, 2013 WL 6800127, at *12 (N.D. Ind. Dec. 20, 2013) (citing *Scott v. Astrue*, 647 F.3d 732, 740 (7th Cir. 2011)). But the onset of disabling symptoms and limitations was a critical issue in this case, given that Ellis was not eligible for disability insurance benefits for any period after December 31, 2008. Accordingly, substantial evidence supports the ALJ's decision to give Dr. Martin's opinion limited weight.

Ellis argues that the ALJ should have re-contacted Dr. Martin or hired a medical expert for clarification regarding onset date instead of using his dubious claim that Ellis was practically unable to work since 1998 to impeach his credibility. (Pl. 9–10.) Ellis further contends that, in doing so, the ALJ also "disregarded" the Court's remand order. (Pl. Br. 9.) The Commissioner responds that the ALJ may reject a treating physician's opinion that is inconsistent with the record without further testimony. (Def. Br. 16.) The Commissioner also notes that the Court order said nothing about whether the ALJ could consider the onset date Dr. Martin provided in evaluating his credibility on remand. (Def. 15–16.)

The ALJ's duty to seek further evidence is triggered only when the evidence before him is insufficient to make a decision or contains inconsistencies that cannot be resolved without more evidence. 20 C.F.R. § 404.1520b. The record in this case, including over 500 pages of medical evidence, was more than sufficient for the ALJ to make a decision. And although there were conflicts in the evidence, they were not unresolvable. The ALJ in this case found that the

conflicts between Dr. Martin's opinion and other evidence in the record did not make an informed decision impossible, but simply reflected poorly on Dr. Martin's assessment of Ellis's limitations. As noted above, the ALJ's assessment was an entirely reasonable. "The fact that the ALJ gave little weight to the opinions of Dr. [Martin] does not mean he had a duty to seek additional information in an attempt to find such opinions credible." *Coleman v. Astrue*, No. 2:06cv00066, 2007 WL 3088074, at *7 (W.D. Va. Oct. 22, 2007). Because the record before the ALJ in this case was sufficient and contained no unresolvable inconsistencies, the ALJ had no duty to develop it further.

  *c.*  *State agency examiners' opinions*

  Separately, Ellis argues that the Commissioner erred in "adopt[ing] the opinion of consultative records examiners, despite claiming that he was only afford[ing] them 'limited weight.'" (Pl. Br. 9.) It is difficult to see what significance this argument has independent of Ellis's primary argument that the ALJ erred in rejecting the treating physicians' opinions. But, in any event, its factual premise is inaccurate. The ALJ noted the state agency consultants' opinions in his decision, and afforded them "only limited weight because the consultants did not have the opportunity to observe Ms. Ellis or the opportunity to consider additional evidence submitted subsequent to their review of the record." (R. 835.) And the record in fact reflects significant differences between the ALJ's assessment of Ellis and the state agency doctors' opinions. The state agency consultative records examiners, Dr. William Amos and Dr. Luc Vinh, both opined that Ellis could perform sedentary work and could lift 10 lbs. occasionally and less than 10 lbs. frequently; the ALJ ultimately came to the same conclusion. (R. 487, 679, 831.) However, the ALJ rejected the state agency doctors' conclusion that Ellis could stand five hours during the work day, limiting her to just two hours of standing. (R, 487, 679, 831.) And, although the ALJ agreed with the state agency doctors that Ellis could sit for six hours in a day, he qualified this

conclusion by requiring that Ellis be allowed short hourly breaks to stand up. (R. 487, 679, 831–32.) Moreover, the ALJ also included in his RFC postural and environmental limitations—such as stooping only occasionally, never climbing, and avoiding all exposure to heights or hazards—rejected by the state agency physicians. (R. 488–89, 680–81, 831.)

Likewise, the ALJ disagreed with both of the state agency psychological consultants. A. John Kalil, Ph.D., who evaluated Ellis's application at the initial phase, found that she had no severe impairments and only mild restrictions in three areas of functioning. (R. 494–506.) Nicole Sampson, Ph.D., who evaluated Ellis's application on reconsideration, found that Ellis's depression was severe and caused moderate difficulty in concentration, persistence and pace, mild restriction in activities of daily living, and mild difficulty in social functioning. (R. 690–702.) The ALJ, like Sampson, found that Ellis's depression was severe and that Ellis suffered mild restriction in activities of daily living and moderate difficulty in concentration, persistence, and pace. (R. 829–30.) However, the ALJ also found that Ellis suffered moderate difficulty in social functioning—a more serious degree of restriction than either Sampson or Kalil endorsed. (R. 830.)

B.    *The ALJ's duty to develop the record*

In two consecutive sentences Ellis asserts both that the ALJ should have arranged for a medical expert to testify at the hearing and that the combination of Ellis's severe impairments equaled a listing. (Pl. Br. 11.) As the Commissioner points out, the disability determination and transmittal forms signed by state agency records examiners (R. 88, 89) provided the required medical opinion that Ellis's impairments did not equal a listed impairment. *See Lee v. Astrue*, Civ. No. 6:11-1518-TMC-KFM, 2012 WL 5384398, at *8 (citing *Smith v. Astrue*, 457 Fed. Appx. 326, 328 (4th Cir. 2011)); SSR 96-6p, 1996 WL 374180, at *3. Additionally, on the "Psychiatric Review Technique" the consulting examiners explicitly noted that Ellis did not have

a mental impairment that met a listing. (R. 494–506, R. 690–702.) Thus, as Ellis's counsel concedes at oral argument, testimony from a medical expert concerning the listing was unnecessary.

Turning to Ellis's other argument, the Commissioner points out that Ellis did not develop her argument about the listing or identify which listing her impairments equal. (Def. Br. 16–18.) At oral argument, counsel for Ellis stated that he believed she equaled the listing for inflammatory arthritis (§ 14.09). At step three of the administrative level, Ellis bore the burden of proof. However, Ellis does not cite and I have not found in the record any opinion—much less a treating physician's opinion—that Ellis's impairments, singly or in combination, met or equaled a listing. Moreover, the ALJ explicitly considered whether Ellis's impairments met or equaled three listings, including § 14.09, and his analysis is not unreasonable on its face. Accordingly, I find that the ALJ's decision that Ellis does not have an impairment or combination of impairments that meet a listing is supported by substantial evidence.

C.     *The Vocational Expert's Testimony*

Finally, Ellis challenges on two grounds the ALJ's reliance on the VE's testimony to find that she could adjust to work available in significant numbers in the national economy. (Pl. Br. 12–13.) First, she argues that the VE failed to account for all of her exertional and non-exertional limitations in testifying that Ellis could perform work as an assembler, inspector, or surveillance system monitor. (Pl. Br. 12–13.) This argument is really an objection to the ALJ's assessment of Ellis's RFC. The ALJ presented a hypothetical to the VE which matched his assessment of Ellis's RFC, and there is no basis in this record for finding that the VE disregarded any of the limitations in the ALJ's hypothetical in his responses. (R. 830–31, 879–80, 887–88.)

Second, Ellis argues that the VE's testimony was unreliable because she could not provide any scientific basis for her opinions about the availability of jobs with a sit-stand option. (Pl. 12–13.) Citing *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993), Ellis maintains that this renders the VE's opinions "incomplete and inaccurate" and therefore "not admissible." (Pl. Br. at 13.)

There are several flaws with this argument. To begin with, *Daubert* interpreted Rule 702 of the Federal Rules of Evidence, and the Federal Rules of Evidence do not apply in Social Security administrative proceedings. 42 U.S.C. § 405(b)(1) ("Evidence may be received at any hearing before the Commissioner of Social Security even though inadmissible under rules of evidence applicable to court procedure."); *Richardson v. Perales*, 402 U.S. 389. 400 (1971) ("[S]trict rules of evidence, applicable in the courtroom, are not to operate at social security hearings so as to bar the admission of evidence otherwise pertinent….").

But even if the Federal Rules did apply, they do not require experts to have a "scientific" basis for every opinion. A federal court may admit an expert's testimony if the expert's "scientific, *technical, or other specialized knowledge* will help the trier of fact." Fed. R. Evid. 702(a) (emphasis added). "[T]here are many different kinds of experts, and many different kinds of expertise." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999). Experts in non-scientific matters need not base their opinions on science, but may rely on their experience.

At the ALJ hearing, Ellis's attorney did not object to the VE's qualification as an expert. (Tr. 877.) The VE testified that someone with Ellis's residual functional capacity (as the ALJ assessed it) would be able to hold a job as an assembler, inspector, and surveillance-system monitor, and gave estimates of the total number of each of these jobs nationally and within a 75 mile radius of the hearing room. (Tr. 878–80.) When Ellis's attorney asked the VE for the basis

of her opinion that a sit-stand option was available for these jobs, she replied, "My experience in job placement." (Tr. 887.) On further questioning from Ellis's attorney, the VE explained in more detail how her experience in placing people led her to this opinion. (Tr. 888–89). On this record, the ALJ reasonably relied on the VE's experience-based opinion testimony.

## IV. Remedy

Ellis has asked, both in her brief and at oral argument, that the Court remand the case for an award of benefits rather than for further proceedings. The choice of remedy in social security cases "lies within the sound discretion of the district court." *Williams v. Astrue*, 861 F. Supp. 2d 688, 692 (E.D.N.C. 2012) (quoting *Edwards v. Bowen*, 672 F. Supp. 230, 237 (E.D.N.C. 1987)). If "the record does not contain substantial evidence to support a decision denying coverage … and … reopening the record for more evidence would serve no purpose," remand for award of benefits is appropriate. *Breeden v. Weinberger*, 493 F.2d 1002, 1012 (4th Cir. 1974). Although the evidentiary record here is complete, I cannot find that the record requires a determination that Ellis is disabled.

When reasonable ALJs could disagree over whether a claimant is disabled, the preferred remedy in Social Security disability cases is ordinarily to remand the case to the Commissioner for further proceedings. *See Lancellotta v. Sec'y of Health & Human Servs.*, 806 F.2d 284, 286–87 (1st Cir. 1986) (Campbell, C.J., concurring). However, remand for award of benefits is also appropriate "where the delay involved in repeated remands has become unconscionable, or the agency has displayed obduracy in complying with the law as set down by the court." *Worzalla v. Barnhart*, 311 F. Supp. 2d 782, 800 (E.D. Wis. 2004).

This case will soon be in its eighth year, so delay is a serious concern. However, the Commissioner stated at oral argument that the case would be given priority status on remand, as it was on the Court's last remand. On the previous remand, the Commissioner convened an ALJ

hearing within six months and disposed of the case within a year. There is no reason to think that proceedings on remand will take longer than that. While this is a close case, particularly given the small amount of benefits involved, I find that giving the Commissioner another chance to decide this case does not create unconscionable delay.

Ellis argues that the Court should remand for an award of benefits because the Commissioner flouted the previous remand order. Specifically, she points to the following passage in Judge Crigler's report and recommendation:

> More than that, the record of the second application is replete with additional evidence that plaintiff suffered non-exertional limitations on her ability to perform work-related activities. If the Commissioner desired to discharge his burden of coming forward at this stage of the sequential evaluation process with evidence, apart from the Medical-Vocational Guidelines ("grids") that demonstrated the availability of gainful work to a person with plaintiff's limitations, the testimony of a VE was required. Because there was additional evidence for which the VE in the first application did not account, one needed to be called here.

(R. 898 (internal quotations, citations, and footnotes omitted).) The ALJ on remand did, of course, call a vocational expert. But Ellis argues that the ALJ disregarded Judge Crigler's observation that "the record … is replete with additional evidence that plaintiff suffered non-exertional limitation on her ability to perform work-related activities." However, this ALJ included at least one limitation that the previous one did not: he restricted Ellis to jobs that allow the employee to stand or walk for two or three minutes after each hour of sitting. Moreover, the Court has never found definitively that Ellis suffers from additional nonexertional impairments. Accordingly, this case does not present the sort of "obduracy" that would justify remand.

## V. Conclusion

For the foregoing reasons, I respectfully recommend that the Commissioner's Motion for Summary Judgment (ECF No. 19) be denied, Ellis's Motion for Summary Judgment (ECF

No. 17) be granted, the final decision of the Commissioner be reversed, and the case be remanded for further proceedings pursuant to the fourth sentence of 42 U.S.C. § 405(g).

**<u>Notice to Parties</u>**

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable Michael F. Urbanski, United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record.

ENTER: May 15, 2014

Joel C. Hoppe
United States Magistrate Judge